IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF GEORGIA

ATLANTA DIVISION

UNITED STATES OF AMERICA,           :

v.                                                      :   CRIMINAL CASE NO.:

DELVIN MOORE,                                :   1:19-CR-452-AT-JSA

                Defendant.           :

## REPORT AND RECOMMENDATION

This matter is before the Court on the Defendant's Motion to Suppress

Identification [29][32]. For the reasons explained below, the Court

**RECOMMENDS** that the Motions be **DENIED**.

### I.     BACKGROUND

Defendant is charged with committing a string of robberies in early 2018.

These robberies were originally investigated by the Atlanta Police Department

("APD") and Dekalb County Police Department ("DPD"), which together

conducted six different photographic lineups with alleged victim-witnesses. In

addition, although not directly relating to a substantive offense charged in this

case, the Government has given notice that it intends to introduce a seventh

photographic identification of the Defendant conducted by the Columbus,

Mississippi Police Department ("CPD"), relating to an alleged robbery in that city

in July 2017. The Court held multiple evidentiary hearings to allow the parties to adduce the facts relating to each of these identifications, as summarized below.[1]

## A. The APD Identifications

APD investigated four robberies of commercial businesses suspected to involve the Defendant between January 19, 2018 and March 28, 2018. Detective David Canup prepared a packet of six photographs that was used with witnesses for each of these robberies. *See* Tr. [50] at 95-96. According to Detective Canup, the investigators received some video of the incidents, and a description of the perpetrator that he summarized as follows:

> The primary thing was black male, possibly lighter skinned or medium complexion. Most of it was with the clothing and what we had on the video. The nose was very descriptive, the nose that we kept seeing on the video. But it was a black male, hoodey up, dark hoodey, and pants that were possibly white-washed, I think maybe some BDUs or something. But the same pants, the same dark hoodey with the hoodey up was the primary thing.

*Id*. at 126-127. Also, "tattoos were referenced, possible teardrops or the – some people saw bigger tattoos than others." *Id*.

---

[1] The evidentiary hearing extended over several separate days over a period of months to accommodate counsels' requests and witness needs. Also, after the testimony was complete and the post-hearing briefing was completed, the Court could not access certain of the electronic files entered into evidence by the Government. The Government supplied a new, substitute copy of the file (Exhibit 1B) that the Court was able to access on April 28, 2021. Thus, this matter was not under submission to the undersigned until April 28, 2021 and the Court **DIRECTS** the **CLERK** to update any calculations of excludable time accordingly.

APD's lineup procedures generally provided that:

Officers shall use a minimum of six photographs when conducting a
photographic lineup. To minimize the possibility of suggestiveness,
the photographs shall:

a. Be recent and depict persons with similar characteristics, such
as sex, race, age, hair style, etc.
b. Be of the same type, size, color, and lighting.
c. Show the suspect only once in the display.
d. Not depict identifying information that would link the suspect
to a specific crime.
e. Be presented so that the suspect's photograph is not emphasized
and does not stand out from the rest. Care should be taken that
the pattern of time sequence of the display is not suggestive.
f. Cover any portion of the photographs which refers to a police
agency, prison facility, age, weight, height, etc.
g. Each photograph will be on a separate sheet of paper and in a
separate folder.

Def. Ex. 1 at 6.

After APD had identified a suspect in this case (i.e., Defendant), Detective

Canup obtained six individual photographs of different individuals and attempted

to choose photographs that would not stand out relative to each other. *Id*. at 96-98.

The photographs in this case all came from the Department of Motor Vehicles

("DMV"). *Id*. at 97-98. Canup attempted to ensure that the photographs were of the

same size and coloring and enlarged the photographs, if necessary, so that they

would be of the same size. *Id*. Per APD's procedures at the time, Canup obtained

six separate photographs that were organized one per page. *Id*. APD, in other

words, no longer used a traditional photo array that compressed all six photographs

on a single page. *Id*. This six-photo group was used for the identification line-ups with the witnesses for the four robberies investigated by APD and was reflected in Government's Exhibits 1A-6A. *Id*.

The first incident investigated by APD was the January 24, 2018 robbery of a Family Dollar Store. The alleged victim-witness, Tanisha Grandison, was contacted by Detective Canup and asked to come review a photographic lineup, which she did on March 2, 2018. *Id*. at 5. The lineup was conducted by APD Investigator Billy Cartwright. *Id*. Cartwright was not involved in the investigation, did not know what Defendant looked like, and had no contact with the victim before or after the lineup. *Id*. at 9, 14. At the beginning of the lineup procedure, Cartwright provided Ms. Grandison an APD admonition form and asked her to read and sign it, which she did. Gov't Ex. 1. The form states:

> You are about to view a group of photographs to see if you can make an identification of the person who was involved in the crime now being investigated.

> This group of photographs may or may not include a photograph of the person involved in this crime.

> You should only make an identification if you can do so.

> You may not talk to anyone while viewing the photographs.

> Since hair styles, beards and moustaches are easily changed, the photographs you are viewing may or may not depict the hair style or the facial hair similar to that of the person who was involved in the crime being investigated.

Also, note that photographs do not always depict the true complexion of a person; it may be lighter or darker than shown.

Pay no attention to markings or numbers appearing in any particular photograph.

Gov't Ex. 1. The form provides a place for the witness to sign to indicate that they understand the instructions, which Ms. Grandison did. *Id*.

Cartwright provided the photographs compiled by Canup, which were organized in six individual manilla folders. *Id*. at 10. Cartwright, who did not know which folder contained the photograph of Defendant, shuffled the folders before handing them to Grandison. *Id*. Cartwright then left the room and stood outside the door, allowing Grandison to review the photographs alone. *Id*. Cartwright reminded Grandison that if she did not recognize any individual to let him know that as well. *Id.* The photographs provided to Grandison were introduced as Gov't Ex. 1A.

As Grandison was reviewing the photographs but before she had finished looking through them all, she announced that she had seen the robber. *Id*. at 10. Cartwright instructed her to finish looking through all the photographs. *Id*. After she did so, she again informed Cartwright that she saw the robber. *Id*. at 10-12. Cartwright instructed her to write "that is the suspect" on the photograph of the individual she recognized to be the robber, which she did. *Id*.  Her identification of one of the photographs, which was the photograph of the Defendant, is reflected in

the handwritten notations on the Exhibit. This procedure was video-recorded and a copy of the recording was introduced as Exhibit 1B.

APD also investigated an armed robbery that occurred at a Rainbow Store on Moreland Avenue in Atlanta on February 8, 2018. On March 8, 2018, Investigator Michael Buckley visited the store to present the same photographic lineup set to the alleged victim-witnesses of that robbery. *Id*. at 32, 39. Buckley did not have another officer with him and so conducted the lineup himself, even though he was aware that the Defendant was a suspect and he knew which photograph depicted the Defendant.

Buckley spoke with Ms. O'Kelley, and this encounter was audio-recorded. The recording was introduced into evidence as Exhibit 2B. The witness stated that the Defendant was a light skinned male, was not tall, and had what looked like a cross tattoo by an eye. *See* Gov't Ex. 2b. Investigator Buckley provided the APD admonition form to the witness, and she indicated that she understood the instructions. Gov't Ex. 2. Buckley then shuffled the manilla folders, handed them to the witness for her review, and stepped approximately 30 feet away during her review. *Id.* at 33-34. O'Kelley reviewed the photographs and informed Buckley after doing so that she had identified one of the individuals depicted. She circled the photograph that she identified and wrote the number "7" on the page, to indicate that she ascribed a level of 7 out of 10 to her identification. *See* Gov't Exs.

2A, 2B. O'Kelley stated that the photograph of the individual displayed dreads, but that the robber did not have dreads at the time of the robbery. *Id*.

Buckley met with another victim-witness of the Rainbow store robbery, Ms. Deshay Telfair, at the witness's home on March 15, 2018. Tr. [50] at 39. This time, Buckley was accompanied by another Investigator (Muldonado). *Id*. at 43, 47. Buckley again carried the same set of six photographs in individual manilla folders.  *Id*. at 41. Ms. Telfair provided a statement as to the incident and description of the robber. Again, Buckley read Ms. Telfair the admonition form and obtained her signed acknowledgement that she understood the instruction, shuffled the folders, handed them to Ms. Telfair, and then stepped away to another part of the house while she reviewed the photographs alone. *Id*. at 40-42. She indicated that she picked an individual from the set. Ms. Telfair circled the robber's photograph and indicated that she was 100% certain of her identification, based on the individual's facial structure and eyes. Exs. 3A, 3B. This lineup procedure was audio-recorded, and the recording was introduced as Exhibit 3B.

On March 14, 2018, Buckley and another investigator (Towns) also met with Ms. Keara Coggins at her apartment. Tr. [50] at 46-47. Ms. Coggins was an alleged victim-witness of a robbery at a McDonalds located on Moreland Avenue in Atlanta, which had occurred on February 17, 2018. *Id*. Buckley engaged in essentially the same procedure as with prior witnesses during this encounter, which

was also audio-recorded. *See* Ex. 4B. Ms. Coggins identified one of the photographs, which she circled. She indicated that she was 100% certain as to her identification, and that although the robber had a bald head at the time (whereas the individual in the photograph had dreads) she would "never forget his face." Exhs. 4A, 4B.

On March 27, 2018, an armed robbery occurred at a Burger King on Moreland Avenue in Atlanta. The next day, Detective Canup and Investigator Golphin went to the store to meet with two witnesses. Tr. [50] at 95-102. They first met with Ms. Princess Brown, a store employee who had been working on the day of the robbery. *Id*. Golphin, who was uninvolved in the investigation and did not know Defendant, conducted the lineup while Canup video-recorded the procedure. *Id*. at 102-103; 7A (photographs), 7B (recording). The procedure was substantially similar to that described in the earlier lineups. After reviewing the photographs in the manilla folders, Ms. Brown indicated that she recognized the robber and circled the photograph. *Id.* at 108, 7A, 7B. Ms. Brown did not give a level of certainty, however, and she stated that she remembered the individual having more tattoos than the individual in the photograph that she identified. Tr. [50] at 108, Ex. 7B. She also stated that she was unsure about whether the hair depicted in that photograph matched that of the robber because he wore a hoodie during the

incident. *Id*. Ms. Brown also stated that the other witness at the store likely had a better look at the robber than she did. *Id*.

The Investigators then separately met with the other witness at the Burger King, Mr. Jaquan Fain. The investigators engaged in substantially the same steps with Mr. Fain, including reading him the admonition form, providing him the same photographs, and videotaping the interaction (Ex. 6B). Mr. Fain "came across a particular picture that obviously shook him a little bit. Basically, he flipped it over and said, that's him." *Id*.; Tr. [50] at 103. Canup instructed the witness to finish reviewing the photographs. *Id.* Mr. Fain confirmed the identification of the photograph that he had flipped over after having reviewed the others. *Id*. Mr. Fain stated that he was very confident in his identification. Ex. 6B.

## B. The DPD Identifications

DPD Detective John Kearney was the investigator assigned to the two robberies of Family Dollar stores investigated by Dekalb County in February and March 2018. Kearney was aware that Defendant had been identified by APD as a suspect for the similar string of robberies in Atlanta and that the suspect had been identified as, among other features, having some tattoos on his face. Tr. [50] at 72, 83. Kearney put together a packet of six photographs, using the same photograph that APD had used of Defendant, and otherwise attempted to find other photographs of individuals with similar facial features. *Id*. at 72-73. Kearney was

unable to find suitable photographs of individuals with the same hair length as well as tattoos, and the robber usually wore a hoodie anyway to obscure his hair, so he cropped the photographs to remove depictions of the hair. *Id*. at 72-73. The photographs were numbered 1-6, on separate pages, were of the same size, and all depicted African-American males. *See* Gov't Exs. 5A, 10, 11.

On February 27, 2018, Kearny and Investigator Winston went to a Family Dollar store on Gresham Road in Dekalb County that had just been robbed the day before. Tr. [50] at 75. They met with an alleged victim-witness, Richard Roane. *Id*. at 74. Kearny provided the witness with DPD's admonition form and instructed him to read the top part. *Id*. at 75. The admonition form that had been provided to another witness was introduced into evidence as Ex. 11. It provides:

> In a moment, I am going to show you a group of photographs that may or may not contain a picture of the person who committed the crime now being investigated. PLEASE DO NOT DISCUSS THIS LINE-UP <u>AT ANY TIME</u> WITH OTHER POTENTIAL WITNESSES.

> The fact that photographs are shown to you should not cause you to believe that a suspect has been arrested or will be arrested. The collection of reliable eyewitness identification evidence and the avoidance of erroneous eyewitness identification are essential in assuring that justice is obtained in our criminal justice system.

> Remember: when viewing a group of photographs you should consider the lighting and how it might affect the complexion of some persons, making them appear lighter or darker. You should also consider the fact that hair styles, facial hair, scars, marks, etc., can be easily changed, added or taken away. Finally, do not be distracted by

any background scenery since photographs are sometimes taken at various locations or obtained from a variety of sources.

Please take your time and study the photographs carefully. Do not allow yourself to be influenced by any police officer or other individuals who may be present. Once you have viewed the photographs, you will be asked to record your viewing.

Ex. 11.

Kearney provided the witness with the six numbered photographs shuffled within a single manilla folder. Tr. [50] at 77-78. After reviewing the photographs the witness identified the individual in photograph number 4 as the robber. The procedure was audio-recorded. *See* Gov't Ex. 5B.

On March 28, 2018, DPD Detective Wheeler went to a Family Dollar store on Bouldercrest Road, which had been robbed the day before. Tr. [57] at 6-7. The witness was named Monique Wheeler.[2] Detective Wheeler was not involved in the investigation. *Id*. at 8. He handed the witness the admonition form, read it to her, and then handed her a manilla folder with the six numbered photographs that had been previously compiled by Kearney. *Id*. at 6-8. After reviewing the photos, Ms. Wheeler (the witness) identified the individual depicted in photograph number 4 as the robber. *Id.* at 8-10, Ex. 11. She indicated that she was "very sure" of her identification and dated it. Ex. 11.

---

[2] The parties do not point the Court to any evidence suggesting that the commonality of the Detective's and the witness's last name was anything more than coincidental.

### C. The Mississippi Identification

In July 2017, Detective Andy Hood of the Columbus, Mississippi, Police Department went to the home of a witness, Ms. Byrd, who had worked the cash register at a store that had been robbed the previous week. Tr. [57] at 24-25, 58-59. Hood knew the name and description of the suspect (which was the Defendant). *Id*. at 54-55. He had previously sent the Defendant's social security and driver's license number to the Mississippi Bureau of Investigation ("MBI") to request that they compile a photographic lineup. *Id*. at 23. Hood provided the six-pack card of photos compiled by MBI to Ms. Byrd and asked her to circle the suspect if she saw him. *Id*. at 28. She reviewed the photographs and circled and initialed the photograph that corresponded to the Defendant. *Id*. at 26. She also informed Hood that she (Ms. Byrd) knew the Defendant by sight and name, because she (Ms. Byrd) was a friend and neighbor of the Defendant's girlfriend. *Id*. at 28-29, 56.

## II.   ANALYSIS

The potential pitfalls associated with eyewitness identifications have been a subject of much academic discussion in recent years. Long considered among the foundations of the American trial system, legal experts are increasingly understanding that eyewitness identification testimony is far more subject to

human fallibility, misperception and suggestion that traditionally assumed.[3]

Nevertheless, the significant remedy of *suppression* of such testimony requires not just a showing of unreliability, but also that unconstitutional police conduct itself tends to unduly suggest an answer to a witness. Here, Defendant asks the Court to suppress identification by seven alleged victim-witnesses conducted by three separate police agencies, based on three separate groups of photos, all of which witnesses identified the same photograph (of the Defendant) as depicting the person who robbed them.

In *Simmons v. United States*, 390 U.S. 377, 384 (1968), the Supreme Court explained that to show a constitutional infirmity, the defendant must show that the police used identification procedures "so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." This standard is applied in a two-part test: (1) whether the identification procedures were unduly suggestive, and, if so, (2) whether, under the totality of the circumstances, the identification was reliable.  *See Blanco v. Singletary*, 943 F.2d 1477, 1508 (11th Cir. 1991); *see also Neil v. Biggers*, 409 U.S. 188, 198-200 (1972). This test

---

[3] For a thoughtful summary of current research authored by a prominent U.S. District Judge, see JED S. RAKOFF., WHY THE INNOCENT PLEAD GUILTY AND THE GUILTY GO FREE (2021), CH. 3 ("Why Eyewitness Testimony Is So Often Wrong?").

applies equally to in-court and out-of-court identifications. *Jones v. Kemp*, 794 F.2d 1536, 1539 (11th Cir. 1986).

If the identification process is determined not to be unduly suggestive, there is no need to proceed to the second part of the analysis and the inquiry ends. *Cikora v. Dugger*, 840 F.2d 893, 895 (11th Cir. 1988).  If, on the other hand, the process is determined to be unduly suggestive, a court must look at the totality of circumstances surrounding the identification, including:  the opportunity of the witness to view the perpetrator at the time of the crime, the witness's degree of attention, the accuracy of a prior description, the level of certainty of the witness, and the length of time elapsing between the crime and the identification.  *Biggers*, 409 U.S. at 199; *see also Manson v. Brathwaite*, 432 U.S. 98, 114 (1977); *Blanco*, 943 F.2d at 508; *United States v. Cannington*, 729 F.2d 702, 711 (11th Cir. 1984). These factors must be weighed against the corrupting effect of the suggestive identification itself. *Manson*, 432 U.S. at 114.

Defendant argues that all the photographic lineups in this case were unduly suggestive both because of the choice of photographs and the manner in which the police conducted the lineups. Because the facts differ among the different sets of identifications, the Court will discuss them individually.

### A.    The APD Photographs

1.    *Undue Suggestiveness*

The APD photo package is reflected in Exhibits 1A-6A. Defendant argues that the choice of photographs necessarily singled Defendant out, primarily because (1) at least three of the six individuals had noticeably darker skin tone, (2) one of the two other individuals with lighter skin tone had obvious freckles, which set him apart from Defendant, (3) Defendant's beard was significantly fuller than that of the other individuals depicted, and (4) Defendant was the only individual depicted with a tattoo.

The Court has reviewed these photographs and finds that, although there is some natural variation between the individuals, the basic features are roughly similar, and no specific feature tends to isolate or call attention to Defendant. While no tattoos clearly appear in any other photograph, the very small and faint possible tattoo or birth mark apparently under Defendant's eye is also barely visible in his own photograph. At least one other photograph (the last one in Gov't Ex. 1A) shows what may be a similarly small and faint mark under the right eye. Another photograph (the third one in Gov't Ex. 1A) depicts an individual with numerous faint marks that appear to mainly be freckles, but also could include one or more small tattoos or other marks. The shadowing in the other photographs leaves open the possibility that some marks may be present there as well.

The beard styles and skin tones are not so different as to draw undue attention, especially considering that APD's admonition form specifically instructs witnesses that hair styles may change and that photographs may not accurately capture skin tone. Moreover, several witnesses noted that the hair style of the robber as depicted in the photograph did not match his specific hair style on the day of the robbery, and/or that they could not tell his hair style because of his clothing. In other words, the differing hair styles of these photographs did not appear to influence the witnesses to pick the Defendant.

The Court simply cannot find this set of photos to be unduly suggestive. *See, e.g., Williams v. Weldon*, 826 F.2d 1018 (11th Cir. 1987) (photo array in which defendant was the only member of his racial group was not unduly suggestive where other individuals, although members of different races, had roughly similar skin tone); *United States v. Ricks*, 817 F.2d 692 (11th Cir. 1987) (while not reflecting best practices, the use of a photo array in which the defendant was the only person wearing glasses was not in itself unduly suggestive).

In terms of procedures, Defendant does not appear to raise any issues as to Investigator Cartwright's lineup procedure employed with Ms. Grandison, except that it occurred approximately five weeks after the robbery. But the passage of time between an incident and the identification is usually assessed under the second prong of the *Biggers* analysis, and not as to whether the identification itself

16

was unduly suggestive. Moreover, courts if anything find the passage of only a few weeks of time to be supportive of reliability, not suggestive of unconstitutionality. *See, e.g., United States v. McComb*, 249 Fed.Appx. 429, 441 (6th Cir. 2007) ("We have held previously that a one month gap between the criminal incident and an identification is a *Biggers* factor in favor of reliability."); *Cf. United States v. Shoels*, 685 F.2d 379, 385 (10th Cir. 1982) (identification that took place two months after crime was not unduly suggestive and the timing did not materially detract from the reliability of the identification). The Court does not find the procedures employed by Detective Cartwright to be unduly suggestive.

Defendant raises more of a challenge with the identifications undertaken by Buckley and Canup, who were both involved in the case and knew which photograph corresponded to Defendant. Also, in one case (Ms. O'Kelley), the investigator met with the witness alone, without a partner. In another case (Ms. Telfair) the witness stated that she was "100% sure" that the photograph she circled depicted the robber, although when Buckley asked her if anyone else looked familiar, the witness oddly stated something to the effect that, "there may be another one, but this is the main one." (Gov't Ex. 3B). Defendant also speculates that in the week in between Buckley's meeting with the two witnesses of the February 8, 2018 Rainbow Store robbery, that the witnesses could have conferred about the identification. In another identification (Princess Brown) the

witness told the Investigators that she did not get as good of a look at the robber as the other victim at the Burger King. Defendant argues that these and other reasons, individually and in combination, render these identifications to be unduly suggestive.

The Court does not find that Defendant has met his burden to show undue suggestiveness as to these procedures. Neither Georgia law nor APD procedures specifically require that an officer uninvolved with the investigation conduct the identification. Rather, the Georgia code alternatively permits an officer who may know the identity of the suspect to conduct the investigation, so long as that officer "use a procedure in which photographs are placed in folders, randomly shuffled, and then presented to the witness so that the individual conducting such procedure cannot physically see which photograph is being viewed by the witness until the procedure is complete." Ga. Ann. Code § 17-20-2(b)(2)(B).

In the case of the Burger King (Ms. Brown and Mr. Fain) identifications, although an officer involved in the investigation was present, he stepped away and allowed the officer, who was uninvolved, to conduct the identification. In the case of the identifications by Investigator Buckley, although he knew which photo belonged to the suspect, he shuffled the photos in individual folders and stepped far away while the witness completed their review. The officers also provided the witnesses with the thorough admonition form and recorded the exact words of the

witnesses after the identification both in writing and by audio. Defendant did not adduce evidence that the officers could see the photographs being viewed or any facts suggesting that any officers—whether those involved in the investigation or otherwise—verbally or non-verbally suggested any answers or were in a position to do such.

In one case, Buckley met with one of the witnesses (Ms. O'Kelley) alone. Neither the written APD procedures nor the Georgia statute specifically required the investigator to bring a second officer. Investigators Cartwright and Canup stated that is their practice generally to try to bring along a second officer as a witness, and it is obviously a best practice to do so where practicable. But the Court cannot otherwise find that Ms. O'Kelley's identification was the result of unconstitutional procedure. Although no other officer was present, this encounter (and all of the other APD encounters) was audio-recorded. Buckley also used the thorough admonition form, shuffled the photos as required, gave the witness space to review the photos on her own, and recorded the witness's own words. There is no indication of any action by Buckley or any other officer that suggested an answer, any identification of any particular photograph, or that the witness identify anyone at all.

One area of the APD SOPs that Investigator Buckley failed to fully follow was as to how he asked the witnesses to state the reasons for their identification.

The SOPs stated that if an identification is made, the officer shall "seek and document in the witness's own words without necessarily referencing a numeric or percentage standard…as to the witness's confidence level that the individual identified is the individual who committed the alleged crime." Def. Ex. 1 at 6. While Buckley mostly complied with these directives, he did appear to suggest that the witnesses express their level of confidence in terms of a numeric standard, thus resulting in Ms. O'Kelley placing the number "7" on the photograph. *See* Ex. 2A. Buckley, however, also properly recorded the witnesses' explanation for their level of confidence in their own words. In Ms. O'Kelley's case, she recognized the photograph as depicting the robber but noted that the photograph showed an individual with dreads whereas the robber did not have dreads. Ex. 2B.

While Buckley should not have prompted the witness to use a numeric or percentage score, the Court cannot find that this relatively small deviation from the standards rendered the identification procedures to be unduly suggestive. There is no indication that Buckley suggested that the witness pick any particular photograph, or any photograph at all. Indeed, the discussion about a numeric score occurred only after the witness had identified the photograph of the robber. Buckley's mere reference to a numeric score also did not suggest to the witnesses that they give any particular answer. Notably, APD procedure and Georgia law does not bar statements as to numeric or percentage scores; these standards simply

provide that the officers should not "necessarily" ask for a numeric or percentage score, but rather should ask for the witness to explain the basis for the identification in his or her own words. In the end, Defendant cannot show that this small deviation from the procedure leads to any substantial risk of a misidentification.[4]

Defendant also points to some ambiguous statements made by certain witnesses. Ms. Telfair did not appear to equivocate in identifying the Defendant's photograph as that of the robber. Confusingly, however, when the investigator asked her whether there was anyone else that she recognized, Ms. Telfair stated words to the effect that "there may have been someone else," but that Defendant was the main one. This confusing response was not clarified in any subsequent questioning. Ms. Brown also made several equivocal statements, noting that she recalled the robber as having more tattoos than the individual she identified, and she specifically noted that she did not see the person as well as the other witness did.

---

[4] Also, these procedural standards were set forth in Georgia statutory law, and APD procedures, neither one of which expressly allow for suppression as a remedy for a violation. While these standards may have been prophylactically enacted to increase the reliability of identifications and avoid challenges, a violation of these non-constitutional rules does not necessary constitute a due process violation. The burden still falls to the Defendant to show an unduly suggestive procedure, which Defendant fails to do here.

These statements are clearly relevant as to the reliability or strength of these identifications. But the Court does not find that they show any unduly suggestive police action. These responses do not tend to show that the officers suggested any answer or affirmative identification of the Defendant. The investigators, rather, simply recorded these arguably ambiguous or equivocal statements of the witnesses. While it does not seem to be good police work for the investigator to have failed to follow up when Ms. Telfair stated that "there may have others" [in addition to the Defendant], this omission does not mean that the investigator suggested that Ms. Telfair identify Defendant in the first place. The record shows, rather, that she made that identification on her own, and that despite the confusing reference to "others" that may have been familiar in some way she persisted in explaining that the Defendant was the "main" one. There is no indication that the officer led the witness to make this statement or to phrase the identification in any particular way. *See, e.g., United States v. Zadiriyev*, No. 8 CR 1327, 2009 WL 1787922 (S.D.N.Y. June 23, 2009) ("having concluded that neither the photo array nor the manner in which it was shown to the witness were unduly suggestive, any evidence that the witness may have equivocated in making the identification goes to the weight to be afforded to the identification and is a matter for trial.")

Because Defendant does not meet his burden to show unduly suggestive police procedures, the Court finds no constitutional violation and must recommend denial of suppression on grounds of unconstitutionality.

2.    *Reliability*

As noted above, the suppression analysis ends if the Defendant does not meet his burden to show the existence of unduly suggestive police procedures. Only if the police used unduly suggestive procedures does the Court proceed to the second prong of the analysis, that is, whether the identifications are nonetheless reliable considering the totality of the circumstances. The undersigned offers these alternative findings on the issue of reliability, if any reviewing court disagrees with the undersigned's findings as to suggestivity.

If there were any use of unduly suggestive procedures leading to the identifications by Ms. Telfair and Ms. Brown, the Court would not find that the Government has met its burden to show overall reliability of those identifications. Under the reliability prong, the equivocal statements of these witnesses weigh substantially in Defendant's favor, and the Government cannot show that the totality of the other circumstances outweighs these factors and affirmatively demonstrates reliability. Thus, the Court would recommend suppression of those two identifications if its findings as to the lack of undue suggestiveness is not adopted.

The Court finds, however, that the Government has met its burden to show reliability as to the remaining APD identifications and would recommend denial of suppression of those identifications on this alternative basis. These identifications were made within days or weeks after the incidents, the witnesses explained that they were in close contact with and had a basis to observe the robber, and they each expressed confidence in and specific details to support their identification. While the robber sometimes wore a hat or hoodie, he did not obscure his face, and all these incidents occurred inside stores or other commercial establishments which were presumably well lit. While issues may exist for trial, the facts here show sufficient reliability as to these identifications so as to avoid exclusion on constitutional grounds, except for those from Ms. Telfair and Ms. Brown.

**B.     The DPD Identifications**

1.     *Suggestiveness*

As with the APD identifications, Defendant first argues that the set of photographs used by DPD (Gov't Exs. 5A, 8, 10) was inherently suggestive. Defendant argues that the photo packet included individuals of clearly different races, skin tones, and ages. Also, while the photographs depicted other individuals with facial tattoos, those tattoos were more distinctive and none had the very subtle teardrop style single tattoo that Defendant has.

The Court has reviewed the DPD photographs and cannot find that Defendant has met his burden to show undue suggestiveness. As with the APD photographs, there is natural variation among the skin tones, although in several cases (e.g., photos 2 & 6) the relative lightness of the tone appears to be an obvious result of lighting differences. Generally, the photos appear to depict individuals of the same racial and/or roughly similar skin tones, generally similar facial hair, and other features. All or nearly all of these photographs depict individuals with facial tattoos or other markings around the left eye, just as Defendant has. While none of these markings exactly matched Defendant's, the Court cannot find that the lack of such a match renders the group of photographs to be subject to suppression. Indeed, the witnesses had all been provided the extensive DPD admonishment form, which instructed them, among other things, that facial hair and markings can change, and that the lighting of the photograph can significantly affect the depiction of skin tone.

Defendant also argues that the method of displaying photographs in the two DPD identifications was unduly suggestive because (1) in both cases, the photographs were numbered 1-6 (with the Defendant's photograph marked as no. 4), (2) the February 27, 2018 identification was conducted by an investigator (Kearney) involved in the case who knew that Defendant was the suspect, and (3) in the March 28, 2018 identification, the investigator (Wheeler) did not record the

identification and did not have another officer present, despite DPD's written procedures providing that identifications "should be recorded on audio tape if circumstances allow." (Def. Ex. 2 at 39).

Although the officers' compliance with internal procedures is not dispositive as to whether a particular identification was unduly suggestive, it bears noting that the numbering of the photographs was actually required by DPD procedures. (Def. Ex. 2 at 39). Defendant elicited evidence that APD's procedures require the opposite, and the APD officers testified that in their opinion, it is better practice not to number photographs. But that different investigators may have different opinions and different police departments may have different procedures does not in itself suggestion suppression. In this case, the mere affixing of numbers does not in itself suggest an identification.

As for Kearny's involvement in the February 27 incident, there is no evidence that he did or said anything to suggest any specific identification. Indeed, the encountered was audio-recorded and Defendant does not point to any statement or verbal exchange suggesting possible influence. Moreover, the admonition form not only instructed the witness at the outset "[d]o not allow yourself to be influenced by any police officer or other individuals who may be present," but then also called for the witness to acknowledge by signature that any identification "was done freely and voluntarily," and "was not influenced in any way by detectives or

26

other personnel administering this line-up or investigating this case." *See, e.g.,* Def. Ex. 5. The Dekalb witnesses both signed this statement. While it may have been a good practice to have an investigator uninvolved in the case conduct the identification, so as to prophylactically prevent any concern of conscious or unconscious influence, that was not specifically required by DPD procedure, and on the record here the Court cannot find that the lack of such a step demonstrated suggestiveness.

The Court is most confused by the failure of Investigator Wheeler on March 27, 2018 to audio-record the interview. DPD procedures currently require audio-recording "if circumstances allow." Here, Wheeler's only explanation for why he did not record the identification was that he understood the instructions from the Dekalb County District Attorney's Office at the time was not to record. Tr. [57] at 19. The local prosecutor's direction not to record this important procedure is not a helpful factor in the Government's favor. Nevertheless, the DPD procedure document that was entered into evidence includes the date footer "12/2019," which date appears to have postdated the identification here by more than 18 months. It is not clear on this record if the procedure to record the identification was current during the March 2018 identification here.

Given this ambiguity in timing, and the other evidence in the record, including the thorough admonition form that the witness signed, in which the

witness wrote a brief statement in her own words and acknowledged that her identification was freely and voluntarily given and was not influenced by anyone, the Court cannot find that the Defendant has proven undue suggestiveness with regard to this identification.

2.   *Reliability*

As explained above, a finding that the DPD procedures were not unduly suggestive would mandate denial of the motion to suppress as to the DPD identifications. Again, however, the Court will proceed to consider the question of reliability under the second prong of the test if that were to prove helpful to any reviewing court.

Unlike as to the APD identifications, the Court cannot find that the Government has met its burden to prove enough reliability as to the DPD identifications to overcome any unduly suggestive procedures. Any ability to meet a burden of proof as to the March 27th identification is hamstrung by the State's purposeful and apparently tactical decision not to record the procedure. This decision may not have been contrary to written procedure at the time, but nevertheless was a purposeful direction from the district attorney. For the prosecutor or police to purposefully avoid creating a record of the encounter would weigh heavily against the Government on any issue as to which it has the burden of proof. Further, the information supplied by the witnesses is more conclusory than

what was supplied by the APD witnesses. According to the written forms, one

witness (Ms. Wheeler) simply stated that she was "very sure" of her identification,

without any additional detail or reasons to explain this level of confidence. As to

the other identification (Mr. Roane), he said that he was "99.9%" sure of the

identification. While these statements of confidence weigh in favor of reliability,

the conclusory nature of the statements substantially limit their value. Witnesses

unfortunately can misstate or misperceive their level of confidence and that is why

it is far more important for the witness to offer concrete, specific reasons for their

identification than conclusory percentages. Here, without such details, the Court

cannot find that substantial facts support any affirmative burden of proof as to

reliability.[5]

---

[5] Even if testimony as to these and other pretrial identifications were suppressed, this would not necessarily mean that any live, in-court identifications by the witnesses should be precluded. Even in the case of unduly suggestive pretrial identifications, the witness is generally permitted to testify in-court as to any identification of the perpetrator unless the facts show a "substantial risk of misidentification at trial." *Dobbs v. Kemp*, 790 F.2d 1499, 1506 (11th Cir. 1986). The undersigned does not find that this standard has been met. As of the writing of this Report and Recommendation, these identifications occurred approximately three to four years ago. By the time of trial, even more time will have passed since any arguably suggestive procedures by these officers. There is no likelihood that these circumstances will continue to materially influence the witnesses' identifications so many years later.

### C.    The Mississippi Identification

Unlike the APD or DPD investigators, Detective Hood used a single page that included a six-pack photo array. In other words, Detective Hood did not use individual photographs organized in their own folders, but rather displayed all six of the photographs on a single page. Detective Hood also conducted the photographic identification himself, although he already knew that the Defendant was the suspect. There was no testimony that Detective Hood stood apart from or in a separate room from the witness while she reviewed the photographs.

Defendant argues that the Mississippi procedure was unduly suggestive for these and other reasons, which would have violated the written procedures in place at APD and DPD. However, Detective Hood testified that the Columbus, MS police department did not have such written procedures at the time that prohibited the use of a single-page photo compilation or that otherwise regulated the administration of a photo lineup. More importantly, even if Detective Hood did not implement the best prophylactic practices, that does not mean that he engaged in unconstitutional conduct that tended to suggest an answer to the witness.  The Court cannot find that Defendant has met his burden to show such conduct. The choice of photos appears to be reasonable and generally reflects individuals with sufficiently similar traits. While it may be now recognized as a better practice to use six individual pages, rather than a single page containing six smaller-sized

photos, Defendant cites no authority for the notion that using the latter was necessarily suggestive. Also, while it would have been better for an officer uninvolved in the investigation to have administered the lineup, Defendant did not adduce any evidence suggesting that Hood said or did anything to suggest that the witness pick any of the specific photos.

Moreover, even if there was something suggestive about the procedures used by Detective Hood, the facts strongly show that the identification was otherwise reliable. The witness specifically explained that she already knew and recognized the Defendant. The witness lived across the street from and was friends with the Defendant's girlfriend, and so the witness actually knew the Defendant prior to the robbery. That the witness had a specific and strong basis to know and recognize the Defendant, and was not relying on just a fleeting perception during the moment of a crime, establishes a strong basis for her identification.

## III.   CONCLUSION

Accordingly, the Motions to Suppress [29][32] should be **DENIED**.

This matter is **READY FOR TRIAL**.

IT IS SO **RECOMMENDED** this 11th day of May, 2021.

_____
**JUSTIN S. ANAND**
**UNITED STATES MAGISTRATE JUDGE**

31